## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL CURRAN and TIMOTHY BORLAND, individually and behalf of all others similarly situated, | Case No.: |
| *Plaintiffs,* | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| The Goodyear Tire & Rubber Company; Compagnie Générale des Établissements Michelin SCA; Michelin North America Inc.; Bridgestone Corporation; Bridgestone Americas, Inc.; Continental Aktiengesellschaft; Continental Tire the Americas, LLC; Nokian Tyres plc; Nokian Tyres North America, Inc.; Nokian Tyres Inc.; Nokian Tyres U.S. Operation LLC; Pirelli & C. S.p.A; Pirelli Tire LLC; Hankook Tire & Technology Co., Ltd.; Hankook Tire America Corp.; Yokohama Rubber Co., Ltd.; Yokohama Tire Corporation; Toyo Tire Corporation; Toyo Tire U.S.A. Corp.; Kumho Tire Co.; Kumho Tire U.S.A.; Sumitomo Rubber Industries, Ltd.; Sumitomo Rubber North America, Inc.; GITI Tire Global Trading Pte. Ltd.; and Giti Tire (USA) Ltd., | |
| *Defendants.* | |

# TABLE OF CONTENTS

**Page**

I.       NATURE OF ACTION ................................................................................................... 1

II.      JURISDICTION AND VENUE ................................................................................... 2

III.     PARTIES ....................................................................................................................... 3

       A.      Plaintiffs ............................................................................................................ 3

       B.      Defendants ......................................................................................................... 3

       C.      Co-Conspirators ............................................................................................. 10

IV.     FACTUAL ALLEGATIONS ..................................................................................... 10

       A.      The Replacement Tire Market ......................................................................... 10

       B.      The Structure and Characteristics of the Market for Replacement Tires Make It Susceptible to Collusion ..................................................................... 13

             i.       Barriers to Entry ................................................................................. 13

             ii.      Inelasticity of Demand ....................................................................... 14

             iii.     Opportunities to Collude ..................................................................... 15

             iv.     History of Antitrust Violations ............................................................ 16

             v.       Market Concentration ......................................................................... 17

       C.      Defendants Announced Unprecedented Increases in Tire Prices Sold in the United States During the Class Period .............................................................. 18

       D.      Defendants Signaled to Each Other in Earnings Calls that Pricing Would Remain High and Monitored Each Other's Pricing Announcements .................. 29

V.       TRADE AND COMMERCE ...................................................................................... 31

VI.     CLASS ACTION ALLEGATIONS .......................................................................... 32

VII.    ANTITRUST INJURY .............................................................................................. 34

FIRST CAUSE OF ACTION ................................................................................................ 35

VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1 ............................ 35

VIII.   REQUEST FOR RELIEF .......................................................................................... 37

IX.      DEMAND FOR JURY TRIAL .................................................................................. 38

Michael Curran and Timothy Borland ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action for damages and injunctive relief under the antitrust laws of the United States, and allege as follows:

## I.      NATURE OF ACTION

1.      This antitrust class action arises from a conspiracy among the world's largest tire manufacturers of new replacement tires for passenger cars, vans, trucks, and buses ("Class Tires") to unlawfully fix, raise, maintain, and/or stabilize the prices of Class Tires sold in the United States.

2.      Plaintiffs allege that Defendants engaged in a conspiracy to restrain trade by participating in an agreement or understanding to raise and maintain prices for Class Tires at artificially high levels in the United States. As a direct result of the conspiracy, Plaintiffs and members of the Class paid more for Class Tires and thus were injured in their business or property.

3.      Replacement tires are tires that replace the original tires that car manufacturers provide with the vehicle. The United States replacement tire market was valued at $57 billion in 2023. Passenger Vehicles constituted $37.6 billion while light truck and commercial truck were valued at $8.5 billion and $8.4 billion, respectively. The remainder of the market consists of agriculture and off-road vehicle tires, which are not part of the proposed class definition.

4.      On January 30, 2024, the European Commission ("EC") conducted unannounced inspections as part of an investigation into suspected price coordination between tire producers.[1] The EC stated that the investigation is focused on the sale of Class Tires sold in Europe.[2] The EC investigation involves many of the named Defendants, as confirmed by Defendants themselves.[3]

---

[1] https://www.reuters.com/business/autos-transportation/eu-antitrust-regulators-raid-tyre-makers-concerns-about-possible-cartel-2024-01-30/

[2] *Id.*

[3] *Id.*

5.      Defendants' unlawful agreement to fix the prices of Class Tires is evidenced by the unprecedented and frequent parallel price increase announcements and public signaling, which without an agreement to fix prices would be against their economic self-interest, the EC investigation into similar conduct, and because the market for Class Tires is highly susceptible to collusion for the following reasons: (a) the market is highly concentrated and dominated by a handful of companies; (b) there exist significant barriers to entry into the marketplace for new tire manufacturers; (c) inelastic demand for Class Tires; (d) common membership in trade associations that allows Defendants the opportunity to exchange competitive information; and (e) a history of antitrust violations.

## II.      JURISDICTION AND VENUE

16.      This Court has federal question jurisdiction pursuant to the federal antitrust laws invoked herein, including the Sherman Act and Clayton Antitrust Act, *e.g.*, 28 U.S.C. § 1331, 28 U.S.C. § 1337(a), and 15 U.S.C. § 15(a).

17.      Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. § 22 and 28 U.S.C. § 1391(b), (c) and (d)), because one or more of the Defendants reside or transact business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

18.      This Court has personal jurisdiction over each Defendant because each Defendant or a subsidiary of each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of Class Tires throughout the United States, including this District; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or

property of persons residing in, located in, or doing business throughout the United States, including this District. The activities of Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the interstate commerce of the United States.

19.     No other forum would be more convenient for the parties and witnesses to litigate this case.

## III.   PARTIES

### A.   Plaintiffs

20.     Plaintiff Michael Curran is a resident of the State of California, residing in Concord, California. He purchased Class Tires within the State of California directly from Defendant Bridgestone during the Class Period defined herein.

21.     Plaintiff Timothy Borland is a resident of the State of Minnesota, residing in Rochester, Minnesota. He purchased Class Tires within the State of Minnesota directly from Defendant Bridgestone during the Class Period defined herein.

22.     Throughout the Class Period, Plaintiffs purchased Class Tires directly from one or more of the Defendants, at elevated prices caused by the conspiracy alleged herein.

### B.   Defendants

#### Goodyear Defendant

23.     The Goodyear Tire & Rubber Company ("Goodyear") is an Ohio corporation with its headquarters in Akron, Ohio. Goodyear is one of the world's leading tire companies and has a significant presence both in the U.S. and globally. It acquired Cooper Tire & Rubber Company in 2021 for $2.5 billion. Goodyear manufactures and sells Class Tires under the brands including but not limited to Goodyear, Cooper, Dunlop, Kelly, Debica, Sava, Fulda, Mastercraft, and Roadmaster. During the Class Period, Goodyear manufactured and sold Class Tires globally,

including in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

**Michelin Defendants**

24.     Defendant Compagnie Générale des Établissements Michelin SCA ("Michelin") is a French corporation with its primary place of business in Clermont-Ferrand, which is in the Auvergne region of France. During the Class Period, Michelin manufactured and sold Class Tires globally, including in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

25.     Defendant Michelin North America Inc., ("Michelin America") is a New York corporation headquartered in Greenville, South Carolina. During the Class Period, Michelin America manufactured and sold Class Tires in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

26.     Michelin America is a wholly owned subsidiary of Michelin. Michelin and Michelin America, collectively, are referred to herein as the "Michelin Defendants."

**Bridgestone Defendants**

27.     Defendant Bridgestone Corporation ("Bridgestone") is a Japanese corporation with its principal place of business in Tokyo, Japan. Bridgestone is the world's largest tire company. During the Class Period, Bridgestone manufactured and sold Class Tires globally, including in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

28.     Defendant Bridgestone Americas, Inc. ("BA") is responsible for the operations of Bridgestone in the Americas. BA is a wholly owned subsidiary of Bridgestone. BA is incorporated in Nevada with its principal place of business in Nashville, Tennessee, and oversees a wide range of activities, including tire production, sales, and other automotive services. During the Class

Period, BA manufactured and sold Class Tires in the United States, both directly and through its predecessors, affiliates and/or subsidiaries.

29.     BA and Bridgestone, collectively, are referred to herein as "Bridgestone" or the "Bridgestone Defendants."

**Continental Defendants**

30.     Defendant Continental Aktiengesellschaft ("Continental AG") is a German company with its principal place of business in Hanover, Germany. During the Class Period, Continental manufactured and sold Class Tires globally, including in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

31.     Defendant Continental Tire the Americas, LLC ("Continental US") is incorporated in Ohio with its headquarters in Fort Mill, South Carolina, and oversees various activities related to tire manufacturing, sales, and distribution in the United States. Continental US is a wholly owned subsidiary of Continental AG. During the Class Period, Continental US manufactured and sold Class Tires in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

32.     Continental US and Continental AG, collectively, are referred to herein as "Continental" or the "Continental Defendants."

**Nokian Defendants**

33.     Defendant Nokian Tyres plc ("Nokian") is incorporated and headquartered in Nokia, Finland. During the Class Period, Nokian manufactured and sold Class Tires globally, including in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

34.    Defendant Nokian Tyres North America, Inc. ("Nokian NA") is incorporated in Delaware and headquartered in Nashville, Tennessee. It is a fully owned subsidiary of Nokian Tyres U.S. Holdings Inc., and a subsidiary of Nokian Tyres plc. During the Class Period, Nokian NA manufactured and sold Class Tires in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

35.    Defendant Nokian Tyres Inc. is a corporation organized under the laws of the State of Delaware. It is a fully owned subsidiary of Nokian Tyres U.S. Holdings Inc., and an indirect subsidiary of Nokian Tyres plc. During the Class Period, Nokian Tyres Inc. manufactured and sold Class Tires in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

36.    Defendant Nokian Tyres U.S. Operation LLC ("Nokian U.S.") is a limited liability company organized in Dayton, Tennessee. It is a fully owned subsidiary of Nokian Tyres U.S. Holdings Inc., and an indirect subsidiary of Nokian Tyres plc.

37.    At times Nokian, Nokian NA, Nokian Tyres Inc., and Nokian U.S., collectively, are referred to herein as "Nokian" or the "Nokian Defendants."

**Pirelli Defendants**

38.    Defendant Pirelli & C. S.p.A. ("Pirelli") is headquartered in Milan, Italy. During the Class Period, Pirelli manufactured and sold Class Tires globally, including in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

39.    Defendant Pirelli Tire LLC ("PTL") is a limited liability company organized in Delaware with its principal place of business in Rome, Georgia. PTL is a wholly owned subsidiary of Pirelli. During the Class Period, PTL manufactured and sold Class Tires in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

40.     PTL and Pirelli, collectively, are referred to herein as "Pirelli" or the "Pirelli Defendants."

**Hankook Defendants**

41.     Hankook Tire & Technology Co., Ltd. ("Hankook") is headquartered in Seoul, South Korea. During the Class Period, Hankook manufactured and sold Class Tires globally, including in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

42.     Defendant Hankook Tire America Corp. ("HTAC") is a New Jersey corporation headquartered in Nashville, Tennessee. HTAC is a wholly owned subsidiary of Hankook. During the Class period, Hankook manufactured and sold Class Tires in the United States, both directly and through its predecessors, affiliates and/or subsidiaries.

43.     Hankook and HTAC, collectively, are referred to herein as "Hankook" or the "Hankook Defendants."

**Yokohama Defendants**

44.     Defendant Yokohama Rubber Co., Ltd. ("Yokohama") is headquartered in Tokyo, Japan, and is a global tire and rubber company. During the Class Period, Yokohama manufactured and sold Class Tires globally, including in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

45.     Defendant Yokohama Tire Corporation ("YTC") is a California corporation with its principal place of business in Santa Ana, California. YTC is a wholly owned subsidiary of Yokohama. During the Class Period, Yokohama manufactured and sold Class Tires in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

46.     YTC and Yokohama, collectively, are referred to herein as "Yokohama" or the "Yokohoma Defendants."

**Toyo Defendants**

47.     Defendant Toyo Tire Corporation ("Toyo") is incorporated in Japan and headquartered in Osaka, Japan. During the Class Period, Toyo manufactured and sold Class Tires globally, including in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

48.     Defendant Toyo Tire U.S.A. Corp. ("Toyo USA") is a California Corporation responsible for Toyo operations in the United States, including the distribution and sale of tires. Toyo USA is headquartered in Cypress, California. Toyo USA is a wholly owned subsidiary of Toyo. During the Class Period, Toyo USA manufactured and sold Class Tires in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

49.     Toya and Toyo USA, collectively, are referred to herein as "Toyo" or the "Toyo Defendants."

**Kumho Defendants**

50.     Defendant Kumho Tire Co. Inc. ("Kumho") is incorporated in South Korea and headquartered in Gwangju, South Korea. During the Class Period, Kumho manufactured and sold Class Tires globally, including in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

51.     Kumho Tire U.S.A., Inc. ("Kumho USA") is a Georgia corporation, headquartered in Atlanta, Georgia. Kumho USA is a wholly owned subsidiary of Kumho. During the Class Period, Kumho USA manufactured and sold Class Tires in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

52.     Kumho and Kumho USA, collectively, are referred to herein as "Kumho" or the "Kumho Defendants."

**Sumitomo Defendants**

53.     Defendant Sumitomo Rubber Industries, Ltd. ("Sumitomo") is a Japanese tire and rubber company headquartered in Kobe, Japan. During the Class Period, Sumitomo manufactured and sold Class Tires globally, including in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

54.     Defendant Sumitomo Rubber North America, Inc. ("Sumitomo America") is incorporated in California with its principal place of business is in Rancho Cucamonga, California. Sumitomo America is a wholly owned subsidiary of Sumitomo. Sumitomo America is responsible for the sales, marketing, and distribution of Sumitomo tires in the United States. Sumitomo acquired the Falken Tire brand in 2003, taking over from its previous owner, Ohtsu Rubber & Tire. Since then, Falken has operated as a standalone brand focusing on ultra-high-performance products, with Sumitomo America. serving as its corporate headquarters in Rancho Cucamonga, California. During the Class Period, Sumitomo America manufactured and sold Class Tires globally, including in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

55.     Sumitomo and Sumitomo America, collectively, are referred to herein as "Sumitomo" or the "Sumitomo Defendants."

**Giti Defendants**

56.     GITI Tire Global Trading Pte. Ltd. ("Giti") is incorporated and headquartered in Singapore. During the Class Period, Giti manufactured and sold Class Tires globally, including in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

57.     Giti Tire (USA) Ltd. ("Giti USA") is a Delaware corporation headquartered in Rancho Cucamonga, California. Giti USA is a wholly owned subsidiary of Giti. During the Class Period, Giti manufactured and sold Class Tires globally, including in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

58.     Giti and Giti USA, collectively, are referred to herein as "Giti" or the "Giti Defendants."

## C.     Co-Conspirators

59.     In addition to the named Defendants, other entities and individuals participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. Specifically, these include Defendants' board of directors, officers, employees, or agents.

60.     Each Defendant's agents operated under the authority and apparent authority of its principals.

61.     Each Defendant through its subsidiaries, affiliates, and agents operated as a single unified entity.

62.     Various persons and/or companies not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

63.     Defendants are jointly and severally liable for the acts of their co-conspirators, whether or not those co-conspirators are named as Defendants in this Complaint.

## IV.     FACTUAL ALLEGATIONS

## A.     The Replacement Tire Market

64.     The Defendants manufacture and sell original equipment manufacturer tires ("OEM Tires") and replacement tires in the United States.

65.     OEM Tires are tires that are specified by the vehicle manufacturer and are initially fitted to the vehicle when new. Vehicle manufacturers collaborate with tire producers to select tires that fulfill various performance criteria for their new models.

66.     Replacement tires, on the other hand, are purchased by consumers to replace the OEM Tires once they wear out, get damaged, or if the vehicle owner desires different performance traits, such as better traction, fuel efficiency, or durability. Replacement tires can be the same brand and model as the OEM Tires or a completely different brand and type, allowing for customization based on the owner's preferences for driving conditions, performance, and budget.

67.     Replacement tires are manufactured using many different materials, including natural rubber to resist tears, synthetic rubber polymers to improve traction and keep the tire inflated, steel wire and textile cord to provide stability, and a soot-like filler called carbon black to reinforce the rubber.[4] Synthetic rubber and carbon black, which together make up roughly half the weight of a car tire, are made from petroleum.[5]

68.     Defendants manufacture and sell replacement tires directly to various types of customers, including tire retail chains and dealerships, automobile manufacturers, commercial fleet operators (businesses that operate large fleets of vehicles, such as logistics companies, bus lines, and rental car companies), government and public sector entities, wholesalers and distributors, online retailers, and automotive service and repair shops.

69.     Many of the Defendants in the United States have established retail and e-commerce websites to sell directly to consumers. These include, but are not limited to, Goodyear, Michelin, Bridgestone, and Pirelli.

---

[4] https://www.propublica.org/article/inflation-tires-rubber-imports-high-prices

[5] *Id.*

70.     Goodyear owns and operates approximately 554 Goodyear Auto Service centers across the United States, providing tire sales, repairs, and automotive services.[6] Goodyear also owns Just Tires, a retail tire chain focused primarily on tire sales and automotive tire-related services. Just Tires has approximately 535 locations in the United States as of December 31, 2023.

71.     Bridgestone owns and operates approximately 2,226 Firestone Complete Auto Care stores, which sell Bridgestone and Firestone tires, along with a range of automotive repair and maintenance services.[7] Bridgestone also owns approximately 500 Tire Plus stores, which sell Class Tires as well.

72.     National Tire Warehouse, the joint venture between Michelin and Sumitomo, has more than 100 distribution centers.[8] National Tire Warehouse sold Class Tires to the Class during the Class Period.

73.     In 2023, the consumer market share for Class Tires in the United States was: independent tire dealerships (66%), auto dealerships (9.5%), mass merchandisers (9%), warehouse clubs (8.5%), tire-company owned dealerships (6%), and miscellaneous outlets (1%).[9]

74.     Independent tire dealerships are tire dealerships that are not owned by tire manufacturers. Sixty-two percent of independent tire dealerships have one location, while 30% have eleven or more locations.[10]

---

[6]     MTD, Modern Tire Dealer, An Industry in Transition. January 2024: https://issuu.com/docs/90275efd97e2e45ff60a4b28de6dad42?fr=xKAE9_zU1NQ

[7] *Id.*

[8] *Id.*

[9] *Id.* at 36.

[10] *Id.*

75.     In 2023, the wholesale market share for tires in the United States was the following: independent wholesale/distributors (80%), tire-company owned (10.5%), and miscellaneous outlets (9.5%).[11]

76.     For passenger vehicles, tires can be categorized based on several criteria, including the type of vehicle, driving conditions, and performance needs. The primary types of replacement tires available for passenger vehicles are all-season tires, summer tires, winter tires (snow tires), performance tires, touring tires, highway tires, all-terrain tires, mud tires, eco-friendly tires, and run-flat tires.

**B.     The Structure and Characteristics of the Market for Replacement Tires Make It Susceptible to Collusion**

    *i.     Barriers to Entry*

77.     High barriers to entry by a new firm into a market are important to cartelization because they prevent the threat of new entrants from undercutting the cartel's supracompetitive prices. During the Class Period, there were significant barriers to entry into the market for Class Tires. A new entrant into the market would face expensive and lengthy start-up costs, including millions of dollars associated with research and development, manufacturing plants, and equipment, energy, and transportation.

78.     There are significant barriers to entry in the United States Tire market:

   A. Defendants have established strong brand reputations over many years. New entrants must invest significant resources in marketing and quality assurance to compete against these well-known brands.

---

[11] *Id.*

B.  The tire manufacturing process is capital-intensive, requiring substantial investment in machinery, technology, and raw materials. Developing Class Tires that meet safety, performance, and environmental standards also involves considerable research and development expenditure.

C.  Defendants have extensive distribution networks and relationships with retailers, auto manufacturers, and service centers. New entrants need to build these networks from scratch or secure partnerships, which can be challenging without an established reputation.

D.  The Tire industry is subject to strict regulations regarding safety, environmental impact, and performance standards (such as tread wear, traction, and temperature resistance). Complying with these regulations necessitates additional resources into investment in testing and compliance.

E.  Defendants, as massive tire manufacturers, benefit from economies of scale that enable them to manufacture Class Tires more efficiently and at lower costs. Any potential new entrants with lower production volumes would find it cumbersome to compete on price and profitability.

    ii.    *Inelasticity of Demand*

79.  Price elasticity of demand is a measure of the change in the demand for a product in relation to a change in its price. Demand is inelastic when an increase in a product's price does not decrease demand. Inelastic demand facilitates cartelization because it allows cartel members to raise prices without fear that consumers will purchase cheaper substitute products.

80.  During the Class Period, demand for Class Tires was, and continues to be, inelastic because Class Tires are essential for vehicle operation, making demand for them less sensitive to price changes. Consumers purchase Class Tires even if prices increase because they are necessary

for operation, safety and vehicle maintenance, rather than luxury or discretionary items where demand might significantly decrease with price hikes.

81.     For most customers, Class Tires are a grudge purchase; they have little time to shop around and a huge information gap.[12] "Consumers don't really have a frame of reference on what a tire should cost, because you only buy them every few years," said Phillip Kane, a business consultant and former executive at Goodyear and Pirelli.[13]

82.     Bill Wood, an economist who studies the plastics and rubber industries, was more blunt: "[t]hey can tell you it's going to cost whatever it's going to cost, and as long as it doesn't sound like it's made out of gold, you're going to say, 'OK.'"[14]

83.     While there are many different brands and types of automobile tires, that substitution is still limited to the universe of products manufactured by the Defendants. By contrast, no viable substitute for replacement tires exists. Furthermore, tires are more inelastic in the short run. For example, a consumer with a punctured tire is relatively price insensitive. While there may be options within the universe of tire brands and specifications manufactured by the Defendants, that does not obviate their immediate need for a replacement tire of some sort.

> iii.     *Opportunities to Collude*

84.     Defendants are members of tire trade associations and professional organizations which they used to facilitate their conspiratorial conduct. Defendants attend numerous regular events through which they had opportunities to communicate in person with one another. Regular

---

[12] https://www.propublica.org/article/inflation-tires-rubber-imports-high-prices

[13] *Id.*

[14] *Id.*

and frequent attendance by Defendants' executives at trade association meetings offers opportunities to collude.

85.    Each Defendant is a member of the United States Tire Manufacturers Association ("USTMA"), the national trade association for tire manufacturers that produce Class Tires in the United States.[15]

86.    Top executives from the Defendants are members of the Board of Directors of the USTMA.[16]

87.    The USTMA holds annual conferences and other meetings, giving Defendants ample opportunity to collude.

       *iv.    History of Antitrust Violations*

88.    The tire market in the United States has a track record of antitrust infractions.

89.    In October 2011, Bridgestone pleaded guilty and paid a $28 million fine for price-fixing and Foreign Corrupt Practices Act violations in the marine hose industry but did not disclose at the time of the plea that it had also participated in the anti-vibration rubber parts conspiracy.[17]

90.    On February 13, 2014, Bridgestone agreed to plead guilty and to pay a $425 million criminal fine for its role in a conspiracy to fix prices of automotive anti-vibration rubber parts installed in cars sold in the United States and elsewhere.[18]

91.    According to the plea deal:

> Bridgestone and its co-conspirators carried out the conspiracy through meetings and conversations in which they discussed and

---

[15] https://www.ustires.org/about-us

[16] *Id.*

[17] https://www.justice.gov/opa/pr/bridgestone-corp-agrees-plead-guilty-price-fixing-automobile-parts-installed-us-cars#:~:text=In%20October%202011%2C%20Bridgestone%20pleaded,anti%2Dvibration%20rubber%20parts%20conspiracy.

[18] *Id.*

agreed upon bids, prices and allocating sales of certain automotive anti-vibration rubber products. After exchanging this information with its co-conspirators, Bridgestone submitted bids and prices in accordance with those agreements and sold and accepted payments for automotive anti-vibration rubber parts at collusive and noncompetitive prices. Bridgestone's involvement in the conspiracy to fix prices of anti-vibration rubber parts lasted from at least January 2001 until at least December 2008.[19]

92.    In 2019, Defendants Bridgestone and Continental were among fifty-two automotive suppliers that paid a total of $23 million in settlements for antitrust law violations brought by the California Attorney General.[20]

*v.    Market Concentration*

93.    The smaller the number of firms in a market, the more conducive a market is to cartelization. The Defendants maintained virtually all of the U.S. Tire market share throughout the Class Period, with the top three companies controlling nearly two-thirds of the market.

94.    The Defendants are among the world's major Tire manufacturers in the United States.

95.    The U.S. Tire market is concentrated in the hands of just a few companies. As of 2022, Goodyear, Michelin, Bridgestone, and Continental made up 69.6% of the entire replacement tire market in the United States.[21] These companies also encompass subsidiary brands which include but are not limited to: Goodyear (Goodyear, Cooper Tires, Dunlop, and Kelly), Michelin (Michelin, BF Goodrich, and Uniroyal), and Bridgestone (Bridgestone and Firestone).[22]

---

[19] *Id.*

[20] https://www.tyrepress.com/2019/12/tyremakers-among-52-automotive-suppliers-in-us23-million-antitrust-settlement/

[21] https://www.traqline.com/newsroom/blog/the-goliaths-of-the-replacement-tire-industry-are-getting-bigger-how-can-the-davids-compete/

[22] *Id.*

Defendants Hankook and Yokohama have a 4.0 percent and 3.6 percent market share, respectively. They are the largest of the remaining manufacturers, comprising the rest of the market.[23]

96.     Due to its high market concentration, the U.S. Tire market has the characteristics of an oligopoly.



## Tire Market Share

**C.     Defendants Announced Unprecedented Increases in Tire Prices Sold in the United States During the Class Period**

97.     During the Class Period, the pricing behavior for Class Tires has been inconsistent with prices in a competitive market. This pricing behavior, combined with other features of the Tire market, indicates the existence of an illegal conspiracy to fix, raise, maintain, and/or stabilize prices for Class Tires.

---

[23] *Id.*

98.     From approximately 2011 to 2020, the prices of Class Tires were relatively stable, with only minor fluctuations that occurred gradually over time. However, in the past four years, tire prices have surged as a result of frequent, synchronized price hikes by the Defendants:



99.     There were at least 65 price announcements for Class Tires during the Class Period among the Defendants.[24]

100.    On or about February 3, 2020, Sumitomo announced a price increase of up to 5% on Falken tires, effective March 1, 2020.

---

[24] All of the following price announcements except for Goodyear can be found on the following website: https://www.tirereview.com/tag/price-increase/

101.    On March 3, 2020, Goodyear announced a price increase of up to 5% on Goodyear and Kelly-brand consumer tires, effective April 1, 2020.[25]

102.    On or about March 12, 2020, Pirelli stated that it would increase prices in the U.S. for tires for cars and light trucks of up to 5% on average, varying by line and tire size, to take effect on April 6, 2020.

103.    On or about October 1, 2020, Bridgestone announced that its "Firestone Truck Bus" and "radial" tire prices would increase between 5% and 8% on November 1, 2020.

104.    On or about October 6, 2020, Yokohama announced a price increase of up to 5% on its consumer tires for high-performance, light truck and passenger vehicle tires sold in the United States to take effect on November 1, 2020.

105.    On or about November 13, 2020, Goodyear announced a 5% increase on Goodyear- and Dunlop-brand consumer tire prices, effective December 1, 2020.[26]

106.    On or about November 13, 2020, Sumitomo announced a price increase on its Falken passenger and light truck and medium truck tires. The medium truck tire increase announced to dealers of up to 6% will have an effective date of December 1, 2020. The passenger and light truck tire increase of up to 8% will have an effective date of January 1, 2021.

107.    On or about December 2, 2020, Bridgestone announced a price increase on all Passenger light truck tires, effective January 1, 2021.

108.    On or about December 3, 2020, Pirelli announced a price increase on car and light truck tires, effective January 1, 2021.

---

[25] https://www.moderntiredealer.com/industry-news/wholesale-distribution/article/11533513/goodyear-will-hike-consumer-tire-prices-2020-03-04

[26] https://www.moderntiredealer.com/topics/industry-news/article/11475914/goodyear-consumer-tire-prices-are-on-their-way-up-2020-11-13

109.    On or about December 22, 2020, Michelin announced a 5% price increase on select Michelin and BF Goodrich passenger and light truck tires, effective February 1, 2021.

110.    On or about January 6, 2021, Continental announced a price increase on select "Continental" and "General" passenger and light truck tires, effective March 1, 2021.

111.    On or about March 1, 2021, Michelin announced a price increase of up to 8% on select Michelin, BF Goodrich, and Uniroyal passenger and light truck tires, effective April 1, 2021.

112.    On or about March 3, 2021, Goodyear announced a price increase up to 8% on Goodyear, Dunlop and Kelly-brand tires, effective on April 1, 2021.[27]

113.    On or about March 9, 2021, Pirelli announced a price increase of up to 7% on car and light truck tires, effective April 15, 2021.

114.    On or about March 15, 2021, Toyo announced a price increase of up to 6% on consumer and commercial tires, effective May 1, 2021.

115.    On or about March 24, 2021, Bridgestone announced a price increase of up to 8% for select passenger and light truck tires, effective May 1, 2021.

116.    On or about April 1, 2021, Yokohama announced a price increase on all its consumer tires, effective May 1, 2021.

117.    On or about April 1, 2021, Bridgestone announced a price increase of 8% on Firestone brand truck and bus radial tires sold in the U.S. and Canada, effective May 1, 2021.

118.    On or about April 12, 2021, Sumitomo announced a price of up to 8% on Dunlop, Falken and Ohtsu brand passenger, light truck, and medium truck tires and Dunlop motorcycle tires, effective May 1, 2021.

---

[27] https://www.moderntiredealer.com/topics/industry-news/article/11473768/goodyear-to-increase-consumer-tire-prices-2021-03-03

119.    On or about May 3, 2021, Goodyear announced a price increase up to 8% on Goodyear, Dunlop, and Kelly-brand consumer tires, effective June 1, 2021.[28]

120.    On or about May 6, 2021, Continental announced a price increase on select "Continental" and "General" passenger and light truck tires, effective July 1, 2021.

121.    On or about May 19, 2021, Michelin announced price increases of up to 6% on select Michelin, BF Goodrich, and Uniroyal passenger and light truck tires, effective July 1, 2021.

122.    On or about May 19, 2021, Pirelli announced a price increase of up to 6% on car and light truck tires, effective July 1, 2021.

123.    On or about June 1, 2021, Bridgestone announced a price increase of up to 8% for select Bridgestone, Firestone, and Fuzion passenger and light truck tires, effective July 1, 2021.

124.    On or about June 14, 2021, Hankook announced a price increase of up to 7% on its passenger car and light truck tires, effective August 1, 2021.

125.    On or about June 15, 2021, Toyo announced a price increase on the dealer base prices across all tire categories of up to 8.5%, effective August 1, 2021.

126.    On or about July 6, 2021, Yokohama announced a price increase on its consumer tires and commercial truck tires, effective August 1, 2021.

127.    On or about July 6, 2021, Sumitomo announced a price increase of up to 8% on Falken and Ohtsu brand passenger, light truck, and medium truck tires, effective August 1, 2021.

128.    On or about August 6, 2021, Goodyear announced a price increase on consumer tires for the fourth time in less than a year, effective September 1, 2021.[29]

---

[28] https://www.moderntiredealer.com/topics/industry-news/article/11473768/goodyear-to-increase-consumer-tire-prices-2021-03-03

[29] https://www.moderntiredealer.com/retail/article/11469453/goodyear-and-cooper-consumer-tire-prices-are-going-up

129.    On or about August 30, 2021, Continental announced price increases on passenger and light truck tires, effective October 1, 2021.

130.    On or about August 31, 2021, Pirelli announced that it will increase prices up to 8% on passenger car and light truck tires, effective October 2021.

131.    On or about September 10, 2021, Giti announced a price increase, effective October 1, 2021.

132.    On or about September 17, 2021, Hankook announced a price increase of up to 6% on passenger, light truck and commercial truck tires, effective November 1, 2021.

133.    On or about September 21, 2021, Sumitomo announced a price increase of up to 10% on Falken and Ohtsu brand passenger, light truck, and medium truck, effective October 1, 2021.

134.    On or about October 19, 2021, Sumitomo announced a price on its Falken medium truck tires, effective December 1, 2021.

135.    On or about October 21, 2021, Yokohama announced a price increase on its consumer replacement tires, effective November 1, 2021.

136.    On or about November 9, 2021, Continental announced a price increase on select passenger and light truck tires, effective January 3, 2022.

137.    On or about December 22, 2021, Sumitomo announced a price increase of up to 8% on Falken, Ohtsu, and private brand passenger and light truck tires, effective January 1, 2022.

138.    On or about December 22, 2021, Toyo announced a price increase on dealer base prices on passenger car, light truck, and commercial truck tire patterns of up to 10%, effective February 1, 2022.

139.     On or about December 28, 2021, Michelin announced a price increase of up to 12% on select Michelin, BF Goodrich, and Uniroyal passenger and light truck tires, effective January 1, 2022.

140.     On or about January 1, 2022, Goodyear announced price increases of up to 12% on consumer and up to 14% on commercial/OTR (Off the Road) tires across all brands.[30]

141.     On or about January 3, 2022, Pirelli announced a price increase of up to 10% on car and light truck tires, effective January 17, 2022.

142.     On or about January 4, 2022, Giti announced price increases on all Giti-produced passenger and light truck and TBR (Truck, Bus, and Radial), tires of up to 10%, starting in January 2022.

143.     On or about January 10, 2022, Yokohama announced a price increase on its consumer tires and commercial trucks, effective February 1, 2022.

144.     On or about January 12, 2022, Bridgestone announced a price increase of up to 14% on Bridgestone and Firestone truck and TBR tires, effective February 1, 2022.

145.     On or about February 7, 2022, Michelin announced price increases of up to 5% on select Michelin, BF Goodrich, and Uniroyal passenger and light truck winter tires, effective April 1, 2022.

146.     On or about February 21, 2022, Sumitomo announced price increases on Falken and Ohtsu brand passenger, light truck, and medium truck tires, effective March 1, 2022.

147.     On or about March 1, 2022, Continental announced price increases on select continental passenger and light truck tires, effective April 1, 2022.

---

[30] https://www.tirebusiness.com/news/goodyear-raise-north-america-tire-prices-july-1

148.     On or about March 2, 2022, Bridgestone announced price increases of up to 10% on non-winter Bridgestone, Firestone, and Fuzion passenger and light truck tires, effective April 1, 2022.

149.     On or about March 23, 2022, Pirelli announced price increases of up to 10% for its car and light truck tires, effective April 11, 2022.

150.     On or about March 24, 2022, Giti announced that price increases on all Giti-produced Passenger and light truck, and TBR tires of up to 8%, starting in May 2022.

151.     On or about April 1, 2022, Hankook announced a price increase on Hankook and Laufenn brand passenger and light truck products of up to 8%, effective May 1, 2022.

152.     On or about May 11, 2022, Michelin announced price increases across its brands ranging from 5-12% on the majority of passenger, light truck, and motorcycle tires and service of up to 9%, effective June 1, 2022.

153.     On or about May 17, 2022, Pirelli announced price increases of up to 10% for car and light truck tires, effective on June 15, 2022.

154.     On or about May 24, 2022, Yokohama announced a price increase on its consumer tires and commercial truck tires, effective July 1, 2022.

155.     On or about June 6, 2022, Bridgestone announced price increases of up to 10% across its portfolio of consumer tires, effective July 1, 2022.

156.     On or about June 10, 2022, Sumitomo announced price increases on Falken-brand passenger, light truck and medium truck products, effective July 1, 2022.

157.    On or about June 15, 2022, Goodyear announced price increases for all Goodyear- and Cooper-brand consumer tires of up to 10%, and on commercial truck tires by up to 6%, effective July 1, 2022.[31]

158.    On or about June 27, 2022, Toyo announced that it would increase the dealer base prices on select passenger car, light truck, and commercial tire patterns of up to 5%, effective August 1, 2022.

159.    On or about September 8, 2022, Bridgestone announced a price increase for consumer and commercial tires, effective October 1, 2022.

160.    On or about December 12, 2022, Pirelli announced price increases of up to 10% for car and light truck tires, effective January 15, 2022.

161.    On or about December 13, 2022, Bridgestone price increases for Bridgestone, Firestone, and Fuzion passenger and light truck tires, effective January 1, 2023.

162.    On or about December 13, 2022, Michelin announced price increases across its brands by up to 9% on select passenger and light truck tires, effective January 1, 2023.

163.    On or about April 7, 2023, Sumitomo announced price increases on Falken brand passenger, light truck, and medium truck tires of up to 7%, effective May 1, 2023.

164.    On or about October 9, 2023, Sumitomo announced price increases of up to 6% on select Falken passenger and light trucks, effective November 1, 2023.

165.    All of the Defendants cited raw-materials and other inflation-impacted costs for the need to raise prices throughout the Class Period.[32]

---

[31] *Id.*

[32] *See, e.g.*, https://www.tirebusiness.com/news/goodyear-raise-north-america-tire-prices-july-1

166.    However, at least one defendant admitted that the increase in prices for Class Tires exceeded any increase in manufacturing costs. On May 6, 2022, Goodyear's Chief Financial Officer, Darren Wells, stated that "our increase in the replacement tire prices more than offset our costs," and reiterated that point several times throughout the call. He went on to state, "[n]ow with the recent announcements that have been made, I think we feel like our competitors are catching up."[33]

167.    As illustrated in the chart below, after the end of 2021, prices for Class Tires continued to increase well after the prices of both types of rubber declined. Synthetic and natural rubber constitute approximately 43% of the cost of manufacturing tires. Further, at least since the end of 2011 until at least 2023, the prices for Class Tires have increased more than either natural or synthetic rubber. While natural and synthetic rubber prices soared in 2016-2017 because of flooding in southeast Asia and production issues with styrene, Tire prices remained relatively flat.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[33] https://seekingalpha.com/article/4507956-goodyear-tire-and-rubber-company-gt-ceo-rich-kramer-on-q1-2022-results-earnings-call



*Sources:*
*US Bureau of Labor Statitistics (PCU3262113262110 and PCU325212325212);*

168.    From May of 2021 to May of 2023, the average price of Class Tires rose 21.4%, over 70% higher than core inflation.[34] As the economy slowed in 2023, many of the costs that drove inflation dissipated, yet Defendants believed that they could keep prices high, which is exactly what they did.[35]

169.    Absent an agreement to fix prices, Defendants would have competed over market share by undercutting their competitor's prices, instead of instituting lockstep price increases.

---

[34] https://www.propublica.org/article/inflation-tires-rubber-imports-high-prices

[35] *Id.*

**D.      Defendants Signaled to Each Other in Earnings Calls that Pricing Would Remain High and Monitored Each Other's Pricing Announcements**

170.    On November 5, 2021, Goodyear's CEO, Rich Kramer, stated on the Q3 2021 earnings call: "So we monitor all those tire manufacturers that are out there. And what we've seen that they've all announced at least three price increases this year…"[36]

171.    On February 11, 2021, Rich Kramer stated on the Q4 2021 earnings call: "It's a really very, very good constructive pricing environment that we've seen right now, probably the best in recent memory."[37]

172.    In the same earnings call, Kramer states: "If we could make more, we can actually even sell more in the environment that we're seeing."[38]

173.    Goodyear's CFO, Darren Wells, stated on the Q4 2021 earnings call: "There are nine competitors that we tend to track and seven out of the nine have announced price increases in the first quarter. And one of the ones who hadn't raised prices right at the end of last year, so we are seeing very consistent pricing across all the significant industry players."[39]

174.    On the Q3 2022 earnings call, an analyst, Rod Lache, asked Goodyear's Richard Kramer, "can you just maybe give us some color on what you're seeing with regard to price discipline? Do you think that the industry is going to kind of take the tack [sic] of trying to support pricing and in order to compensate for inflation?" Richard Kramer answered, "So I would say, yes,

---

[36]    https://seekingalpha.com/article/4466211-goodyear-tire-and-rubber-company-gt-ceo-rich-kramer-on-q3-2021-results-earnings-call

[37]    https://seekingalpha.com/article/4486435-goodyear-tire-and-rubber-companys-gt-ceo-rich-kramer-on-q4-2021-results-earnings-call

[38]    *Id.*

[39]    *Id.*

I think that there is an acknowledgment of what price and mix has to do in the marketplace to deal with the environment we're in."[40]

175.    During the Q1 2022 earnings call, Continental's CFO, Katja Dürrfeld, referred to sustainable pricing several times, including: "[t]o mitigate the broad inflationary headwinds, implementation of sustainable pricing is mandatory."[41]

176.    In 2022, Michael Graber, CEO of Toyo, stated that "[p]rice increases have been a necessary counteraction to increased costs in raw materials, logistics and labor for Tokyo and everyone else in the industry."[42]

177.    On June 17, 2022, Nokian announced that it had "succeeded in implementing price increases to mitigate cost inflation."[43]

178.    The frequency of the Defendants' price announcements and public signaling and the coordinated nature of the price hikes, such as the effective date and the specific products affected, ensured that the conspiracy would be effective.

179.    As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class paid higher prices for Class Tires sold by Defendants than they would have in a competitive market, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

---

[40] https://seekingalpha.com/article/4551459-goodyear-tire-and-rubber-co-gt-q3-2022-earnings-call-transcript

[41] https://seekingalpha.com/article/4510196-continental-aktiengesellschafts-cttaf-management-on-q1-2022-results-earnings-call-transcript

[42] https://www.tirebusiness.com/news/rising-tire-prices-affected-several-factors

[43] https://www.reuters.com/business/autos-transportation/finlands-nokian-tyres-lifts-sales-outlook-despite-russia-uncertainty-2022-06-17/#:~:text=%22However%2C%20tire%20demand%20has%20remained,it%20said%20in%20a%20statement.

## V.     TRADE AND COMMERCE

180.     During the Class Period, each Defendant and/or one or more of its subsidiaries sold Class Tires in the United States in a continuous and uninterrupted flow of interstate and foreign commerce, including through and into this District.

181.     During the Class Period, Defendants collectively controlled a substantial portion of the market for Class Tires in the United States.

182.     The activities of Defendants in connection with the production, sale, and/or importation of Class Tires, and the conduct of Defendants and their co-conspirators as alleged herein: (a) affected United States interstate commerce; (b) affected United States import trade or commerce; and/or (c) had a direct, substantial, and reasonably foreseeable effect on United States domestic trade or commerce and/or United States import trade or commerce. Given the marketing, importation, and sales of Class Tires in the United States by Defendants, and the volume of affected commerce, as alleged herein, such effects were direct and substantial.

183.     In addition, because the United States is one of the world's largest markets for Class Tires, it is reasonably foreseeable that Defendants' wrongful conduct would raise and artificially inflate prices for Tires sold in the United States and would have an effect on United States domestic trade or commerce and/or United States import trade or commerce.

184.     As a result of Defendants' conduct, Plaintiffs and members of the proposed Class paid more for Tires during the Class Period than they would have in a competitive market and thus sustained injuries to their business or property in violation of Section 1 of the Sherman Act.

/ / /

/ / /

/ / /

/ / /

## VI.     CLASS ACTION ALLEGATIONS

185.     Plaintiffs bring this action on behalf of themselves, and all others similarly situated, and as a class action under Federal Rule of Civil Procedure 23(b)(2) and (b)(3), on behalf of the following ("the Class"):

> All persons and entities in the United States who purchased Class
> Tires directly from any of the Defendants and/or their subsidiaries
> or affiliates from February 7, 2020 to the present.

186.     Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

187.     *Numerosity*. The members of the Class are so numerous as to render their individual joinder impracticable. Although the precise number of Class members is unknown, based upon information and belief Plaintiffs allege that the Class contains at least tens of thousands of members geographically dispersed throughout the United States. The true number of Class members is known by Defendants through their records and files, however, and, thus, may be notified of the pendency of this action through electronic mail, first class mail and/or by published notice.

188.     *Typicality*. Plaintiffs' claims are typical of the claims of the members of the Class because their claims arise from the same course of conduct by Defendants and the relief sought within the Class is common to each member.

189.     *Existence and Predominance of Common Questions.* Common questions of law and fact exist as to all members of the Class and predominate over any question affecting only individual Class members. These common legal and factual questions, each of which also may be certified under Rule 23(c)(4), include but are not limited to the following:

A.  Whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to restrain trade by fixing, raising, maintaining, and/or stabilizing prices of Tires sold in the United States;

B.  The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

C.  Whether the alleged conspiracy violated the antitrust laws;

D.  Whether the conduct of Defendants and their co-conspirators, caused Plaintiffs and Class members to suffer an injury to their business or property;

E.  Whether the conduct of Defendants and their co-conspirators caused the prices for Tires sold in the United States to be higher than they would be in a competitive market;

F.  Whether Plaintiffs and other members of the class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

G.  The appropriate class-wide measure of damages.

190.    These and other questions of law or fact are common to the members of the Class and predominate over any questions affecting only individual members of the Class.

191.    *Adequacy of Representation.* Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained trial counsel highly experienced in complex litigation including complex antitrust class action litigation, and Plaintiffs intend to vigorously prosecute this action. Plaintiffs have no interest in this action that is adverse or antagonistic to the interests of the Class.

192.    *Superiority*. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens on the Court and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the members of the Class to seek redress for the violations of law alleged herein.

193.    Furthermore, the Class may be certified under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

### VII.    ANTITRUST INJURY

194.    Defendants' anticompetitive conduct had the following effects, among others:

A.    Price competition for Tires has been restrained or eliminated;

B.    The prices of Tires have been fixed, raised, stabilized, and/or maintained at artificially inflated levels;

C.    Purchasers of Tires have been deprived of free and open competition;

D.    Purchasers of Tires paid artificially inflated prices; and

E.    Purchasers of Tires sustained an injury to their businesses or property.

195.    The purpose of the conspiratorial conduct of Defendants and their co-conspirators was to raise, fix, or maintain the price of Tires. As a direct and foreseeable result, Plaintiffs and the Class paid supra-competitive prices for Tires during the Class Period.

196.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury to their businesses or property, having paid higher prices for Tires than they

would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

197.    Defendants' acts in furtherance of the contract, combination, or conspiracy to restrain trade were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

198.    The injury to Plaintiffs and the Class members is injury of the type that the antitrust laws were meant to prevent.

## FIRST CAUSE OF ACTION

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

199.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

200.    The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace.

201.    Defendants and their co-conspirators entered into and engaged in a contract, combination or conspiracy to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

202.    At least as early as four years prior to the filing of the lawsuit and continuing until the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement or understanding to restrain trade by fixing, raising, stabilizing, and/or maintaining prices for replacement tires.

203.    Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate trade or commerce by causing prices for Tires to be higher than they otherwise would be in a competitive market.

204.    As a result of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been harmed in their businesses or property by paying inflated prices for Tires.

205.    In formulating and carrying out the alleged agreement or understanding to restrain trade, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint. Defendants' conspiracy had the following effects, among others:

A.    Price competition in the market for Tires has been restrained, suppressed, and/or eliminated in the United States;

B.    Prices for Tires sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

C.    Plaintiffs and members of the Class who purchased Tires from Defendants, their divisions, subsidiaries, and affiliates, and all their co-co-conspirators, have been deprived of the benefits of free and open competition in the purchase of Tires.

206.    Defendants took all the actions alleged herein with the knowledge and intended effect that their actions would proximately cause the price of Tires to be higher than it would be but for Defendants' conduct.

207.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and members of the Class have been injured in their businesses or property and will continue to be injured in their businesses or property by paying more for Tires than they would have paid in the absence of the conspiracy.

208.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

## VIII.   REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of himself and all others similarly situated, request relief and pray for judgment against Defendants as follows:

209.    An Order certifying the Class under the appropriate provisions of Rule 23 (b)(2) and (b)(3) of the Federal Rules of Civil Procedure;

210.    An Order appointing Plaintiffs as Class representatives and appointing its counsel as Class Counsel;

211.    Declarations that Defendants' actions, as set forth above, are unlawful and in violation of the Sherman Act;

212.    An award to Plaintiffs and the Class of actual damages trebled in an amount to be determined at trial;

213.    A permanent injunction under Section 16 of the Clayton Act enjoining Defendants from engaging in any conduct determined to be unlawful;

214.    An award to Plaintiffs and the Class of pre- and post-judgment interest;

215.    An award to Plaintiffs and the Class for their costs of suit, including reasonable attorneys' fees and expenses; and

216.    An award of such other relief as the Court may deem just and proper.

/ / /

/ / /

/ / /

/ / /

/ / /

## IX.    DEMAND FOR JURY TRIAL

217.    Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of

Civil Procedure, of all issues so triable.


Dated:  February 23, 2024                     */s/ Laurie Rubinow*


Laurie Rubinow
**MILLER SHAH LLP**
65 Main Street
Chester, CT 06412
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
lrubinow@millershah.com

Anna K. D'Agostino
**MILLER SHAH LLP**
225 Broadway, Suite 1830
New York, NY 10007
Telephone: 866-540-5505
Facsimile: 866-300-7367
akdagostino@millershah.com

Daniel L. Warshaw (*Pro Hac Vice* forthcoming)
Bobby Pouya (*Pro Hac Vice* forthcoming)
Michael H. Pearson (*Pro Hac Vice* forthcoming)
Eric J. Mont (*Pro Hac Vice* forthcoming)
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
dwarshaw@pwfirm.com
bpouya@pwfirm.com
mpearson@pwfirm.com
emont@pwfirm.com

Jill Manning (*Pro Hac Vice* forthcoming)
**PEARSON WARSHAW, LLP**
555 Montgomery Street, Suite 1205
San Francisco, CA 94111
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
jmanning@pwfirm.com